IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DAVID ROBERTS,<br><br>            Plaintiff,<br><br>vs.<br><br>CITY OF OMAHA, a Political Subdivision of the State of Nebraska; OMAHA POLICE DEPARTMENT, an Agency of the City; JOSH MARTINEC, his in individual and official capacity; PHILLIP RICKER, in his individual and official capacity; ERICH JONES, in his individual and official capacity; and JUSTIN RADERS, in his individual and official capacity;<br><br>            Defendants. | 8:11CV129<br><br><br>MEMORANDUM AND ORDER |

This matter is before the court on a motion for summary judgment filed by defendants City of Omaha ("the City"), Joshua Martinec, Phillip Ricker, Erich Jones and Justin Raders ("the individual defendants" or "the officers"), Filing No. 32; the defendants' motion in limine, Filing No. 59; and the defendants' motion to amend their motion for summary judgment to assert the defense of qualified immunity, Filing No. 71.

This is an action for deprivation of constitutional rights under the Civil Rights Act, 42 U.S.C. § 1983, and for disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794(a). In his § 1983 claim, the plaintiff alleges that the defendant officers used excessive force during a confrontation in which he was shot and wounded.[1] The plaintiff's ADA and Rehabilitation Act claims against the individual officers for disability discrimination are

---

[1] In particular, the parties agree to the following controverted issues: whether the individual defendants, together or separately, violated the Fourth and Fourteenth Amendments by (1) seizing the plaintiff without probable cause to believe he either had committed or was about to commit a crime, (2) using unreasonable force when they attempted to handcuff him; and (3) using unreasonable force in shooting him six times. See Filing No. 80, Order on Final Pretrial Conference at 2. The plaintiff's claim against the City based on the policies and practices that resulted in the use of excessive force (Count II) has been bifurcated from the § 1983 claims against the individual officers and stayed. See Filing No. 28, Order.

based on allegations that they (1) mistook symptoms of schizophrenia for criminal behavior and (2) failed to follow established policy and procedure for handing mentally unstable people. See Filing No. 80, Order on Pretrial Conference ("Pretrial Order") at 2-3. The plaintiff's disability discrimination claims against the City are based on the allegation that it failed to provide properly trained officers or failed to train officers to properly respond to calls involving mentally ill persons. See Filing No. 80, Order on Final Pretrial Conference at 3-4.

In their motion for summary judgment, the defendants contend that undisputed evidence shows that the officers' use of force was reasonable as a matter of law. Further, they argue that the plaintiff's ADA and Rehabilitation Act claims are subject to dismissal because undisputed evidence shows that the officers' use of force was not due to the plaintiff's disability but to the plaintiff's objectively verifiable violent misconduct.

## I. Defendants' Motion for Leave to Amend

A threshold issue is the defendants' motion for leave to amend their motion for summary judgment to include the defense of qualified immunity. Defendants argue that the briefing on the pending motions shows that consideration of the qualified immunity defense, which defendants raised in their answer, is appropriate. They also contend that no further briefing is necessary. The plaintiff opposes the motion, arguing the motion is untimely and will unduly prolong the case.

The court finds that the parties' earlier submissions cited qualified immunity cases and obliquely referred to the doctrine of qualified immunity. The parties have had, or should have had, enough notice of the issue to adequately respond.

Accordingly, the court will grant leave to add the defense and will treat the issue as having been raised.

## II. Defendants' Motion in Limine

The defendants' motion in limine also relates to the motion for summary judgment in that the defendants seek to exclude certain portions of the expert opinions of Michael Lyman, which the plaintiff has submitted in opposition to the defendants' motion for summary judgment. Filing No. 59, Motion in Limine; Filing No. 49, Index of Evid., Attachment 3, Ex. 26, Report of Michael Lyman, Ph.D. Defendants further seek exclusion of "all other testimony, comment, or argument by any person about (a) the propriety or impropriety of the police officers' conduct or actions prior to the seizure of David Roberts or (b) any alternative measures or tactics that the officers should have followed." Filing No. 69, Motion to Amend Motion in Limine. The defendants argue only that the expert opinions are not relevant, they do not challenge the expert's qualifications. The plaintiff opposes the motion, contending that the expert testimony is relevant to (1) whether the plaintiff was unreasonably seized by law enforcement officers before he was shot; (2) the totality of the circumstances, and (3) the plaintiff's failure to act claims and ADA claims.[2]  Filing No. 65, Brief at 2.

Although the motion in limine is an important tool available to the trial judge to ensure the expeditious and evenhanded management of the trial proceedings, performing a gatekeeping function and sharpening the focus for later trial proceedings, some evidentiary submissions cannot be evaluated accurately or sufficiently by the trial

---

[2] It appears that the plaintiff's failure-to-act claims have been abandoned. No such claim is included in the Pretrial Order. See Filing No. 80.

3

judge in such a procedural environment. *Jonasson v. Lutheran Child and Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997). A motion in limine is appropriate for "evidentiary submissions that clearly ought not be presented to the jury because they clearly would be inadmissible for any purpose." *Id.* In other instances, it is necessary to defer ruling until during trial, when the trial judge can better estimate the impact of the evidence on the jury. *Id.* To the extent that a party challenges the probative value of the evidence, an attack upon the probative sufficiency of evidence relates not to admissibility, but to the weight of the evidence and is a matter for the trier of fact to resolve. *United States v. Beasley*, 102 F.3d 1440, 1451 (8th Cir. 1996).

The court is unable to evaluate the relevance of the challenged evidence in the context of a pretrial motion. The defendants' concerns may warrant a cautionary or limiting instruction, but the court cannot determine the ambit of such an instruction at this time. The court will admit the evidence at issue only on a showing that it is relevant to the issues in the case, and only to the extent that the relevance of the evidence outweighs its potential to cause prejudice or confusion under Fed. R. Evid. 403. The court finds the motion can be adequately resolved at trial, either in a hearing immediately prior to commencement of the trial, as an objection with a sidebar, or with a review of the evidence outside the presence of the jury. Accordingly, the court finds that the motion in limine should be overruled at this time, without prejudice to its reassertion via timely objection to the admissibility of such evidence at trial.

### III. Defendants' Motion for Summary Judgment

#### A. Facts

In the Pretrial Order, the parties agree to the following uncontroverted facts. *See*

Filing No. 80, Order on Final Pretrial Conference at 1-2.  David Roberts is a resident of Omaha, Douglas County, Nebraska.  The City of Omaha is a political subdivision, organized and existing by virtue of the laws of the State of Nebraska.  At all times material to this action the City of Omaha operated the Omaha Police Department.  The Omaha Police Department is a public entity within the terms of the Disability Act and Rehabilitation Act.  At all times material to this action Josh Martinec, Phillip Ricker, Erich Jones, and Justin Raders were sworn law enforcement officers employed by the Omaha Police Department.  At all material times, the actions of the officers were taken under color of state law and the City of Omaha was receiving federal funds.

On January 11, 2010, David Roberts, was residing with his parents and siblings at 7625 Springfield Drive, Omaha, Nebraska. He had been diagnosed with schizophrenia.  At approximately 5:13 a.m., David Roberts' mother, Wanda Roberts, called 911 and requested police come to the house.  Officers Joshua Martinec and Phillip Ricker were dispatched to the house and told by the 911 dispatcher that there was a disturbance involving a schizophrenic individual who had attempted to assault a sibling with a knife or screwdriver.

Officers arrived outside the home at 5:18 a.m.  Officers Raders and Jones later arrived at the Roberts house to assist those officers.  Upon arrival at the Roberts' house, Martinec and Ricker spoke with David Roberts' parents.  While the officers waited, David's mother attempted to get David to come out of the basement to talk to the police.  He refused.  Officer Martinec then spoke to David from upstairs in an attempt to get him to come out of the basement.  David Roberts refused to come upstairs.  The officers then went into the basement.  At 5:24 a.m. a rescue squad was

5

summoned to take David Roberts to the hospital where he received medical treatment for bullet wounds. David Roberts has no recollection of the shooting.

The evidence submitted in connection with the motion for summary judgment, viewed in the light most favorable to the plaintiff, establishes the following. See Filing No. 34, Defendants' Brief, Statement of Undisputed Facts at 2-6; Filing No. 37, Plaintiff's Brief, Statement of Undisputed Facts at 1-15; Filing No. 54, defendants' reply brief at 9-13. After the plaintiff indicated he wouldn't come upstairs, the officers went downstairs. Officer Martinec had drawn his firearm and Officers Ricker, Jones, and Raders had drawn their Tasers. The officers made contact with the plaintiff who was in a curtained-off room in the basement. Initially the plaintiff was lying on his bed.

The officers told the plaintiff to show his hands and raise them. The plaintiff got up on his knees on the bed and put his hands up. The plaintiff was calm and coherent. Officer Martinec testified he told the plaintiff twice to lie down on the floor and the plaintiff did not do so. The officers' testimony indicates that the instruction to lie down was not clear with respect to where the plaintiff was asked to move. The space was extremely cramped and all of the officers were in close quarters with the plaintiff. The plaintiff was given only seconds to comply with the officers' commands. Officer Ricker grabbed the plaintiff's left arm and Officer Martinec observed a knife. Officer Raders testified he saw something silver in the plaintiff's hand. Officer Martinec fired six times at the plaintiff from a distance of four feet. Officer Ricker was holding the plaintiff, chest to chest, and Officer Martinec testified he feared he might shoot his partner. None of the other officers fired their weapons. Officer Martinec testified that the plaintiff was

shot in both arms, both legs, the abdomen and the side of the chest.[3] The plaintiff's mother and brother stated in affidavits that they heard shots fired in two groups of two or three. The plaintiff was shot six times. Afterward, Officers Martinec and Ricker placed plaintiff in handcuffs. Officer Martinec called for a rescue squad and plaintiff was transported to the hospital.

It is also undisputed that the Omaha Police Department has voluntary crisis team intervention training for officers specifically dealing with mentally ill persons. The crisis intervention team training is 40-hour certification training for officers on how to deal with people who are mentally ill and in crisis. There is no specific mandate or criteria within the Omaha Police Department as to when a crisis-intervention-team-trained officer should be called to a scene. Officer Ricker testified that he vaguely remembered police academy training on handling mentally unstable persons. Officer Martinec stated that he had no recollection at all of the academy training. Officer Martinec also stated that it would be fair to say that the plaintiff's schizophrenia did not change the way he would have handled the call.

### B. Law

Qualified immunity shields a government official from liability and the burdens of litigation unless his conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982). An official is entitled to qualified immunity unless (1) the evidence, viewed in the light most favorable to the plaintiff, establishes a

---

[3] The plaintiff argues that he was shot in the back. Both parties have submitted hospital photographs of the plaintiff in support of and opposition to that contention. Without some explanatory evidence or testimony, the court is not able to discern exactly what the photographs portray.

violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). To overcome a defendant's assertion of qualified immunity, a plaintiff must produce sufficient evidence to create a genuine issue of fact as to whether the defendant violated a clearly established right. *Carpenter v. Gage*, 686 F.3d 644, 648 (8th Cir. 2012). "[A]t the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences." *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008). When qualified immunity is raised at the summary judgment stage, the proper course is to view the facts and draw reasonable inferences in the light most favorable to the plaintiff—which "usually means adopting . . . the plaintiff's version of the facts"—and then to assess the constitutionality of the challenged conduct. *Scott v. Harris*, 550 U.S. 372, 377-78 (2007). However, when the nonmoving party's version of events is so utterly discredited by the record that no reasonable jury could believe it, the court should not rely on "such visible fiction." *Id.* at 381-82 (2007) (finding that the district court should have viewed the facts in the light depicted by a videotape of the event at issue).

"'Claims of excessive force are evaluated under the reasonableness standard of the Fourth Amendment.'" *Johnson v. Carroll*, 658 F.3d 819, 825 (8th Cir. 2011) (quoting *McKenney v. Harrison*, 635 F.3d 354, 359 (8th Cir. 2011)). "'Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" *Id.* (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009). Under the Fourth Amendment, law enforcement officers may use only such force as is objectively reasonable under the circumstances. *Graham v. Connor*, 490

8

U.S. 386, 397 (1989). The court must "determine whether a use of force was reasonable by balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Johnson v. Carroll*, 658 F.3d at 825 (quoting *McKenney,* 635 F.3d at 359).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In reviewing whether use of force is reasonable, the court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (noting that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.") "In circumstances that are 'tense, uncertain, and rapidly evolving,' whether the use of force was reasonable must embody an allowance for the fact that police officers are often forced to make split-second judgments about the amount of force that is necessary in a particular situation. *Johnson,* 658 F.3d at 826 (quoting *Graham*, 490 U.S. at 396–97). The court examines whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his subjective intent or motivation. *Estate of Morgan v. Cook*, 686 F.3d 494, 496 (8th Cir. 2012). The court considers the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively fleeing or resisting arrest. *Graham* at 396.

9

"The degree of injury suffered in an excessive-force case 'is certainly relevant insofar as it tends to show the amount and type of force used.'" *Johnson v. Carroll*, 658 F.3d at 826 (quoting *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011)). "The use of deadly force is not constitutionally unreasonable if an officer has 'probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others.'" *Estate of Morgan*, 686 F.3d at 497 (quoting *Nance v. Sammis*, 586 F.3d 604, 610 (8th Cir. 2009)) (affirming grant of summary judgment to officer who fatally shot a suspect in a domestic disturbance after the suspect, despite repeated commands, failed to drop a knife and moved toward the officer); *see also Loch v. City of Litchfield*, 689 F.3d 961, 967 (8th Cir. 2012) (finding it objectively reasonable to shoot an intoxicated man reported to be armed with a firearm who turned and moved toward the officer despite the officer's repeated orders to get on the ground). However, it is unreasonable to use deadly force when the officer "could not reasonably have believed that [the suspect] . . . posed any threat." *Tennessee v. Garner*, 471 U.S. 1, 21 (1985) (involving a "young, slight, and unarmed" burglary suspect shot in the back of the head while he was running away on foot). Also, before employing deadly force, an officer should give "some warning" when it is "feasible" to do so." *Id.* at 11–12 (also stating "notwithstanding probable cause to seize a suspect, an officer may not always do so by killing him"). The Eighth Circuit Court of Appeals "has declined to second-guess whether alternative actions by police officers 'might conceivably have been available.'" *Estate of Morgan*, 686 F.3d at 497 (quoting *Cole v. Bone*, 993 F.2d 1328, 1334 (8th Cir. 1993)). Since 1985, it has been established by the Supreme Court that the use of deadly force against a fleeing suspect who does not pose a significant threat of death or

serious physical injury to the officer or others is not permitted. *Moore v. Indehar,* 514 F.3d 756, 763 (8th Cir. 2008) (citing *Garner*, 471 U.S. at 11).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A plaintiff under Title II of the ADA must show that he is a qualified individual with a disability denied participation in, or the benefits of, the services, programs, or activities of a public entity because of his disability. *Gorman v. Bartch,* 152 F.3d 907, 912 (8th Cir. 1998). To prevail on a claim under the Rehabilitation Act, a plaintiff must demonstrate that: (1) he is a qualified individual with a disability; (2) he was denied the benefits of a program or activity of a public entity; (3) the entity receives federal funds; and (3) he was discriminated against based on his disability. 29 U.S.C.A. § 794(a)(1). Because Title II of the ADA and the Rehabilitation Act are nearly identical, cases interpreting either the ADA or the Rehabilitation Act are applicable and interchangeable. *Gorman,* 152 F.3d at 912 (noting that the Rehabilitation Act has a federal funding requirement, whereas the Rehabilitation Act does not).

A "qualified individual with a disability" is broadly defined as any person who "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2); *see Gorman,* 152 F.3d at 912. The term "public entity" is defined as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1); *see Gorman,* 152 F.3d at 912. "A local police

11

department falls 'squarely within the statutory definition of "public entity."'" *Id.* (quoting *Pennsylvania Dept. of Corrs. v. Yeskey,* 524 U.S. 206, 210 (1998). Further, "[c]overed programs or services do not need to be voluntary, for 'the words [of the statute] do not connote voluntariness.'" *Gorman,* 152 F.3d at 912 (quoting *Yeskey,* 524 U.S. at 211) (holding that transportation of arrestees is a covered service). Federal regulations "indicate that 'benefit' includes 'provision of services, financial aid, or disposition (i.e., handling, decision, sentencing, confinement, or other prescription of conduct).'" *Gorman,* 152 F.3d at 913 (quoting 28 C.F.R. § 42.540). Also, "'[t]he general regulatory obligation to modify policies, practices, or procedures requires law enforcement to make changes in policies that result in discriminatory arrests or abuse of individuals with disabilities.'" *Id.* (quoting 28 C.F.R. Part 35, App. A, Subpart B).

In the context of arrests, courts have recognized two types of Title II claims: (1) wrongful arrest, where police arrest a suspect based on his disability, not for any criminal activity; and (2) reasonable accommodation, where police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees. *See Gohier v. Enright,* 186 F.3d 1216, 1220-21 (10th Cir. 1999); *see also Gorman,* 152 F.3d at 912-13 (holding that a paraplegic arrestee could make out a reasonable accommodation claim under the ADA after being injured in a police van not equipped with wheelchair restraints); *but see Thao v. City of St. Paul,* 481 F. 3d 565. 569 (8th Cir. 2007) (holding at the summary judgment stage, without deciding the adequacy of training or whether a municipality can be liable under the ADA for failure to train, that the plaintiff had not shown that "police would have responded differently had they [accommodated the

12

plaintiff] under the ADA."). A reasonable police response to assault with a deadly weapon is not a violation of Title II. *Sanders v. City of Minneapolis*, 474 F.3d 523 (8th Cir. 2007) (determining that the facts and circumstances of the case did not support an ADA/Rehabilitation Act claim); *see also Waller ex rel. Estate of Hunt v. Danville*, 556 F.3d 171, 175 (4th Cir. 2009) (holding in a hostage situation that exigency is one circumstance that bears materially on the inquiry into reasonableness under the ADA).

## IV. Discussion

### A. Section 1983

Viewing the evidence and drawing all reasonable inferences in the light most favorable to the plaintiff, the court cannot as a matter of law find that the officers' use of force was objectively reasonable. There are factual disputes with respect to whether the officers reasonably believed the plaintiff committed a crime, whether he was a threat to the officers, himself, or others, and whether he was actively resisting arrest. The plaintiff disputes the officers' timeline of events and disputes that it was necessary at first to handcuff or "secure" him in order to ensure the safety of people in the home. The court agrees that the timeline of events is subject to dispute and should be determined by the jury. However, when the record is examined in the light most favorable to the plaintiff, there is no evidence from which a reasonable jury could conclude that the plaintiff was secure and was not a threat to officers or anyone else in the home when they found him in the basement. The police were called specifically because the plaintiff represented a threat to his family. Proper police practice requires securing a suspect in handcuffs before being taken into custody. This practice is for the safety of the officers and the suspect. To the extent the plaintiff relies on the theory that

the officers attempts to secure the plaintiff or take him into custody were improper, that claim is dismissed.[4] Whether the officers used excessive force in securing the plaintiff is a separate issue and one that should be resolved by a jury.

There is no dispute that three Tasers and a gun were brandished at the plaintiff. Further, there is no dispute that the plaintiff was calm and coherent when approached by the officers. The officers admit that the plaintiff was compliant with their direction to kneel on the bed and put his hands up. There is also evidence from which a jury could find that the officers' subsequent instruction to the plaintiff to "lie down" was confusing and that the plaintiff's failure to follow that command was the result of confusion or misunderstanding rather than defiance. There is also some evidence suggesting that Officer Martinec continued to fire shots at the plaintiff after he was subdued and no longer posed a threat.

Although the officers testified to the presence of a knife, from the record the court cannot discern the level of threat posed by the knife described or how it was brandished, if at all. The plaintiff has no recollection of the events and cannot provide countervailing testimony. Nevertheless, circumstantial evidence—the short time frame, the plaintiff's apparently calm mental state, the presence of four officers (three with Tasers) in close proximity, the lack of any serious assault that precipitated the incident, the extent of the plaintiff's injuries, the fact that the plaintiff was being held by an officer, and the evidence of a pause in shots—suggests that a rational juror could find that the

---

[4] Specifically, this finding refers to the claim involving "[w]hether the individual Defendants, together or separately, deprived Plaintiff of rights secured to him by the Fourth and Fourteenth Amendments to the United States Constitution by seizing Plaintiff without probable cause to believe he either had committed a crime or he was a danger to himself or others." See Filing No. 80, Pretrial Order at 2.

use of deadly force against this plaintiff may have been unreasonable. Determination of the issues will require assessments of credibility. Under the totality of the circumstances, a rational fact-finder could discredit the police officers' story and could conclude that the officers' actions were unreasonable in light of the nature of the threat. Whether the officers had an objectively reasonable belief that they faced a significant risk of death or serious physical injury in these circumstances is a question of fact for the jury.

### B. ADA and Rehabilitation Act

Summary judgment dismissing the plaintiff's ADA and Rehabilitation Act claims is similarly not warranted because there are enough facts in the record to demonstrate that the plaintiff was/is a qualified individual with a disability; that he was denied the benefits of police protection and emergency response services; and he was denied those services because of his disability. There is evidence from which a jury could infer that the officers' initial seizure of the plaintiff was due to his disability and not for any criminal activity. Further, there is evidence from which a jury could find that the officers failed to reasonably accommodate the plaintiff's disability during the encounter. Whether and to what extent plaintiff's actions amounted to violent misconduct is similarly a question of fact for the jury. There are also issues of fact with respect to the adequacy of the City's training. Accordingly, the court finds that genuine issues of material fact preclude entry of summary judgment in this case.

IT IS ORDERED:

1. The defendants' motion to amend their motion for summary judgment to assert the defense of qualified immunity, Filing No. 71, is granted.

2. The defendants' motion in limine, Filing No. 59, is overruled at this time, without prejudice to its reassertion via timely objection to the admissibility of such evidence at trial.

3. The defendants' motion for summary judgment, Filing No. 32, is granted in part and denied in part, consistent with this opinion.

Dated this 10th day of October, 2012.

BY THE COURT:

s/ Joseph F. Bataillon
United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.